IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FISH NET, INC., trading as THAT FISH PLACE — THAT PET PLACE, | : | CIVIL ACTION |
| Plaintiff, | : : : | |
| v. | : | NO. 09-5466 |
| PROFITCENTER SOFTWARE, INC. And SYSTEMAX INC. | : : : | |
| Defendants. | : : | |

# **M E M O R A N D U M**

**STENGEL, J.**                                                                                         October 17, 2013

Plaintiff, Fish Net, Inc., trading as That Fish Place — That Fish Place ("FNI"), brought this diversity jurisdiction suit against Defendants ProfitCenter Software, Inc. ("PCS") and Systemax Inc. ("SI"), alleging state law claims for fraud, breach of contract, breach of warranty, and unjust enrichment.[1] Presently before the Court are the Defendants' Motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. SI's Motion seeks judgment on all of FNI's remaining claims against it; PCS's Motion only seeks judgment on FNI's claims for special, incidental or consequential damages, including lost profit damages. For the reasons that follow, both Motions are granted.

---

[1] On November 16, 2009, FNI filed its initial Complaint asserting claims for fraud, breach of contract, and breach of warranty against PCS, as well as a claim for breach of contract against SI and a claim for unjust enrichment against both defendants. See Doc. # 1, ¶¶ 64-95. After Defendants moved to dismiss the initial Complaint, FNI filed a First Amended Complaint ("FAC") with leave of the Court, reasserting the same claims. Doc. # 18. Defendants then renewed their Motion to dismiss.
    In an Opinion dated March 31, 2011, I granted the Defendants' Motion in part. The fraud claim was dismissed under the "gist of the action" doctrine. Doc. # 47 at 8-12. The Motion was denied as to the breach of contract and breach of warranty claims. Id. at 12-21. I granted the motion to dismiss the unjust enrichment claim against PCS, but denied the motion to dismiss the unjust enrichment claim against SI. Id. at 20-21.

## I. THE SUMMARY JUDGMENT RECORD[2]

PCS is a wholly-owned subsidiary of SI, and SI routinely markets PCS's products and services. SISUF ¶ 3; Def. Ex. G, Aff. of Lawrence Reinhold ("Reinhold Aff."), at ¶¶ 2-3. In Spring 2005, FNI began discussions with PCS to purchase and implement the PCS software system and services ("the software"). Def. L, Dep. of Richard Amour ("Amour Dep.") at 31:1-32:10. On December 23, 2005, FNI entered into a "Software Master Agreement" and a "Professional Services Agreement" with PCS. SISUF ¶ 4; Def. Mot. Ex. A, PCS Master Agreement; Ex. B, Professional Services Agreement. Before entering into the contracts, FNI engaged in a selection process among several vendors before selecting PCS. PCSSUF ¶ 2. The contracts were mutually negotiated by the parties. PCSSUF ¶ 2; Amour Dep. at 28:4-30:23, 44:6-53:22; Def. Mot. Ex. N, Dep. of Scott Lebowitz ("Lebowitz Dep.") at 17:2-27:3.

After an implementation period, the software was launched for FNI's use on January 10, 2007 (the "go-live"). SISUF ¶ 5; PCSSUF ¶ 7. According to FNI, the software encountered performance problems during the implementation period that forced FNI to abandon the implementation system process and return to business under its old system. FAC ¶ 17.

After the go-live, FNI claims it experienced a significant number of failures within the software, including the duplication of credit charges, orders that were stuck in the system, erroneous gift card transactions, inaccurate sales tax calculations, incorrect pricing, incomplete customer information, replenishment problems that created weeks of stock outages, credit card refunds that could not be processed, and website checkout errors that significantly reduced online

---

[2] SI and PCS have each filed Statements of Undisputed Facts ("SISUF" and "PCSSUF" respectively) in support of their Motions. (Doc. Entry 77, 93.) FNI has failed to respond to either SUF, and has not filed any counterstatements. Thus, according to the Policies and Procedures of this Court, the Statements "may be taken by the court as admitted." Stengel, J. Policies & Procedures at § II.C.4.

customer conversions. SISUF ¶ 6 (citing FAC ¶ ¶ 23-25). According to FNI, lack of sound accounting practices in the financial modules of the software and PCS's failure to utilize appropriate industry standard practices to ensure a smooth transition to the new website were most damaging. Id.; FAC ¶ 25. As a result of these problems, FNI claims that it experienced a sales decline of thirty percent and the loss of thousands of customers. Lebowitz Dep. at 42:18-43:11, 46:13-19.

The Chief Executive Officer of PCS, Matthew Ehrlich, resigned from the company in early July 2007. SISUF ¶ 7. In the late summer of 2007, a meeting was arranged at FNI's request with Bruce Leeds, SI's Chief Financial Officer and a member of the Board of Directors of SI and PCS, and George Winter, SI's Chief Executive Officer, to discuss the problems FNI was experiencing with the software. Scott Lebowitz, FNI's Chief Financial Officer, and Rick Amour, FNI's then vice-president (and now its Chief Operating Officer), attended for FNI. SISUF ¶ 8-9; Lebowitz Dep. at 5:22-23, 41:1-5; Def. Mot. Ex. R, Dep. of George Winter ("Winter Dep.") at 24:7-19; Def. Ex. O, Dep. of Bruce Leeds ("Leeds Dep.") at 28:8-29:19. At the meeting, Leeds told Lebowitz that he was "going to fix all of [FNI's] problems. He personally was going to see to it that all of our problems were fixed." Lebowitz Dep. at 45:4-6. Leeds said that "he will stand behind it and Systemax will stand behind it," and that "[w]e will make you whole." Id. at 45:7-10, 45:13-14; SISUF ¶ 18; Winter Dep. at 53:7-14. When Lebowitz stated that FNI wanted to be compensated for its losses, but could not calculate the losses due to the problems with the software, Leeds told Lebowitz that SI would look at FNI's financials, calculate its losses, and make it whole. SISUF ¶ 19; Lebowitz Dep. at 45:17-46:7, 46:13-47:6. During the course of the summer 2007 meeting, Leeds offered, FNI accepted, and PCS then issued, a $50,000 credit from PCS to be applied against the costs of implementing the

3

software. SISUF ¶¶ 15-16 (Amour Dep. at 114:22-115:2; Lebowitz Dep. at 47:9-10; Leeds Dep. at 34:18:22; Winter Dep. at 53:23-54:11.) Leeds also asked FNI to prepare a list of its most important issues and said that he would follow up to see that the list was provided to appropriate people at PCS to address the identified problems.[3] SISUF ¶ 17; Amour Dep. at 112:8-113:18; Lebowitz Dep. at 57:19-58:2; Leeds Dep. at 28:21-29:6, 38:20-39:3; Winter Dep. at 52:5-19, 60:12-61:24, 109:9-19, 142:6-10.

There is no writing reflecting any of the promises and agreements made at the summer 2007 meeting. SISUF ¶ 21; Lebowitz Dep. at 54:25-55:17. FNI had no further communication with Leeds or any other SI executive after the summer 2007 meeting. SISUF ¶ 22; Amour Dep. at 119:1-8; Lebowitz Dep. at 50:14-17.

On June 1, 2009, SI announced plans to exit the PCS-hosted software business and to work with PCS's existing clients to transition to other providers. SISUF ¶ 23. It made this decision after determining that PCS had consistently lost money and would not likely become profitable in the near future. SISUF ¶ 24; Reinhold Dep. at 15:12-16:11, 18:22-19:6; Leeds Dep. at 24:8-26:18. Although all other PCS clients then using the software made other arrangements, FNI still runs its business using the software. SISUF ¶ 26; Amour Dep. at 182:21-189:6; Reinhold Dep. at 22:19-23:14.

The two contracts between FNI and PCS each contained a limitation of liability provision that excludes special, incidental or consequential damages, including lost profits, in the event of a breach. PCSSUF ¶ 3-5. FNI's CEO and COO each acknowledged reading these contract

---

[3] SI asserts as fact that Leeds made these promises before FNI raised a possibility that it might end its relationship with PCS and use a different software provider. SISUF ¶ 20; Leeds Dep. at 45:2-16, 46:8-47:6. However, this issue is disputed. See Amour Dep. at 110:18-24 (stating that FNI threatened to "go elsewhere" before the summer 2007 meeting).

provisions when FNI entered into the contracts with PCS. PCSSUF ¶ 6; Amour Dep. at 44:6-53:22; Lebowitz Dep. at 15:20-23, 19:25-20:2, 24:12-26:6.

## II. STANDARD OF REVIEW

A court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the court that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (citations omitted). The court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

## III. DISCUSSION

### a. SI's Motion for Summary Judgment

SI asserts that it is entitled to summary judgment on FNI's breach of an oral contract claim because of the absence of any evidence that a contract was ever formed between these two parties. It also asserts that it is entitled to summary judgment on FNI's unjust enrichment claim

5

because FNI has not produced any evidence to show that SI unjustly retained any benefit at FNI's expense. I find that SI is entitled to summary judgment on both claims.

### 1. Breach of Contract Claim

To establish a cause of action for a breach of contract, a plaintiff must establish: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages. Atchison v. Sears, 666 F. Supp. 2d 477, 497 (E.D. Pa. 2009) (quoting J.F. Walker Co. Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)). In Pennsylvania, an enforceable contract exists when the parties to the contract: (1) reach a mutual understanding; (2) exchange consideration; and (3) delineate the terms of their bargain with sufficient clarity. Id. at 497 (quoting Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003)).

Mutual understanding and manifestation of intent is generally established through evidence of offer and acceptance. Jenkins v. Cnty. of Schuylkill, 658 A.2d 380, 383 (Pa. Super. Ct. 1995). However, in some circumstances, "manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." Restatement (Second) of Contracts § 22(2) (1981). A contract may therefore be implied in fact if the "surrounding facts of the parties' dealings" supports the conclusion that a contract was formed. Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984). Implied contracts can arise "under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to

contract." Id. (quoting Pollock Indus., Inc. v. Gen. Steel Castings Corp., 201 A.2d 606, 610 (Pa. Super. Ct. 1964)).[4]

The summary judgment record is undisputed that, by the time the summer 2007 meeting, FNI already experienced numerous problems with the PCS software and had expressed its displeasure to Ehrlich, the CEO of PCS, and George Winter, the CEO of Systemax. Lebowitz Dep. at 41:1-43:11. In response to FNI's request for a meeting, Winter and Leeds met with FNI's executives, and Leeds made the statements that FNI argues created a contractual obligation on SI. Leeds Dep. at 28:8-16. I find that FNI has failed to meet its summary judgment burden to create a genuine issue of material fact that Leeds was acting on behalf of SI, and not PCS, when he allegedly made promises to FNI at the summer 2007 meeting.

---

[4] Preliminarily, SI asserts that Pennsylvania law requires that "clear and precise evidence" of an oral contract must be established for FNI's breach of contract claim to survive summary judgment. (Doc. Entry 77 at 8-9.) FNI responds that the "preponderance of the evidence" standard must be applied to its claim. (Doc. Entry 83 at 6–7.) The Pennsylvania Supreme Court has not yet ruled on which burden of proof must be applied when examining a summary judgment motion regarding an oral contract. Billet Promotions, Inc. v. IMI Cornelius, Inc., Civ. A. No. 95-1376, 1998 WL 721081, at *13 (E.D. Pa. Oct. 14, 1998). However, recent case law from this court concerning this issue has outlined a framework for deciding which burden of proof must be used. In Quandry Solutions Inc. v. Verifone Inc., Civ. A. No. 07-97, 2009 WL 997041 (E.D. Pa. April 13, 2009), Judge Dubois held that the preponderance of the evidence standard of proof should be applied to determine the survival of an oral contract claim on summary judgment. Id. at *6–7. He determined that under Pennsylvania law "oral contracts must, in some circumstances be proven by 'clear, direct and precise' evidence." Id. at *6. These circumstances include: (1) an oral contract to make a will; (2) an oral contract which modifies, changes, or cancels a prior written contract; and (3) claims against a decedent's estate. Id. (citing Billet Promotions, 1998 WL 721081, at *13 (holding that "it was not error to apply the preponderance of the evidence standard [in jury instructions] because [the] case involved a simple oral contract")). Accordingly, the court held that the preponderance of the evidence standard must be used in cases involving "garden variety oral contracts." Id.
  I find that the preponderance standard applies to the FNI – SI dispute. FNI's claim is that an oral contract was formed between them that SI would make it whole. FNI is **not** asserting that this oral contract modified the written agreements it had with PCS. Accordingly, it does not fall within any of the three types of oral contracts for which a heightened evidentiary standard has been applied. Additionally, I find that FNI has not shown under either standard that an enforceable contract existed between it and SI.

Pennsylvania law holds that "one cannot be liable for a breach of contract unless one is a party to that contract." Electron Energy Corp. v. Short, 597 A.2d 175, 177 (Pa. Super. Ct. 1991) (citing Viso v. Warner, 369 A.2d 1185 (Pa. 1977)). SI argues that the actions taken and words spoken by Leeds, an executive officer of SI, during the summer 2007 meeting were on behalf of PCS, and not SI. (Doc. Entry 77 at 11.) SI asserts that this is shown by the undisputed facts that (1) the $50,000 credit given to FNI as a result of the meeting was a credit for PCS services, (2) the credit was ultimately issued by PCS, and (3) that FNI did not demand a payment from SI to satisfy an alleged SI obligation. Id. The only evidence that FNI presents to show that SI was a party to an oral contract with FNI is:

- Lebowitz's testimony that he "wanted to meet with somebody from Systemax with authority that could pursue this and have a conversation about what they were going to do." Lebowitz Dep. at 41:23-42:1.
- Leeds stated at the meeting that he "personally was going to see to it that all of [FNI's] problems were fixed. And he said he will stand behind it and Systemax will stand behind it. . . . He said, Systemax, I guarantee you will stand behind this and fix the problems." Id. 45:7-10; 46:8-12.
- The attendance at the meeting of SI's CEO Winter and its CFO Leeds, see Leeds Dep. at 28:8-29:19; Winter Dep. at 24:7-19, demonstrates that they represented SI in the agreement made with FNI.

I find that Leeds's statements during the meeting fail to provide evidence that FNI and SI made an oral contract to fix FNI's problems. Leeds's statements — as recounted by Lebowitz — that SI would stand behind PCS and make FNI whole are too vague to demonstrate that a meeting of minds occurred creating an enforceable obligation upon SI. Lebowitz's account of

8

Leeds's statement is also devoid of context. The summary judgment record shows that, later in his deposition, Lebowitz was also asked "did Bruce Leeds tell you what, if any, involvement he had — he had had with PCS before this meeting? . . . Did Bruce Leeds say in words or these words or in words to this effect that he was stepping in until they hired a new CEO?" Lebowitz Dep. at 61:16-23. In response, Lebowitz testified "Did he say he was stepping in until they found a new CEO? . . . Yes." Id. 61:25-62:3. Viewing this evidence in the light most favorable to FNI as the non-moving party, the only reasonable inferences that may be taken from this testimony is either that (1) Leeds was stepping in to run **PCS** until a new CEO for PCS could be hired; or (2) Leeds was stepping in to solve the problems FNI **had with PCS** until a new CEO could be hired. No reasonable jury could find that Leeds made enforceable contractual promises to FNI on behalf of SI.

The conclusion that FNI has failed to meet it burden to show that Leeds was acting on behalf of SI is further supported by the testimony of Rick Amour, FNI's vice-president. He testified that Leeds stated at the meeting that "He would be overseeing our account. He would be ensuring that a team was put together to address our problems." Amour Dep. at 112:24-113:1. According to Amour, Leeds asked FNI to "identify the top 15 issues that we were experiencing, or promises that had been made, and that he would follow up on that list and he would see that those things were addressed as soon as possible." Id. 113:6-10. Regarding financial compensation, Amour testified that Lebowitz "turned the topic to how — how Systemax intended to compensate us for all the problems that we've had. . . . Ultimately they agreed that as a starting point we would receive a new website at no charge. . . . Matt [Ehrich] had given us $50,000 towards that some time prior, and Bruce agreed to give us an additional $50,000 to be applied toward that implementation cost. . . . And Bruce said that, moving

9

forward, we would look at a way of making you whole financially from here forward, but let's focus on your problem." Id. 113:19-22; 114:13-15; 114:24-115:9. Nothing in this testimony creates an inference that Leeds was acting on behalf of SI in making these promises.

Lebowitz's additional testimony concerning the next step in the efforts to solve the problems with the software also fails to create a jury issue that SI had made enforceable promises. He testified that, after the summer 2007 meeting, John Marrah was hired to run PCS as its new CEO. Lebowitz Dep. 54:20-22; 58:3. After he assumed the job, approximately two months after the summer 2007 meeting, Marrah spoke with Lebowitz to continue the discussion in his capacity as CEO of PCS about financial compensation to FNI. Id. 58:19-21.[5] Accordingly, I conclude that FNI has failed to meet its summary judgment burden of creating a genuine issue that an oral contract between FNI and SI was formed.

Even if it could be found from the summary judgment record that Leeds obligated SI to fix FNI's problems and "make it whole," I find that these promises are too indefinite to be enforced. "An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." Lackner v. Glosser, 892 A.2d 21, 30-31 (Pa. Super. Ct. 2006) (citing Biddle v. Johnsonbaugh, 664 A.2d 159, 163 (Pa. Super. Ct. 1995). "Where, however,

---

[5] Lebowitz testified:

> So they got John Marrah. And we were like, good. We know John. John knows us. He knows we're honest people. He knows we do what we say. He knows our company history. We can work with this guy. So John comes in. And I said, John — well, actually, he called me. And he said that he was talking to Bruce Leeds and he wanted to know what kind of things we were looking for. . . . And you know, I told him we were promised a new website, the $50,000 credit. I said — I said John, I want $2 million. I said, I've been hurt at least $2 million. . . . And he said, I don't have the authority to do that. I'm going to have to talk to Systemax.

Leeds Dep. at 46:8-12.

there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Lackner, 892 A.2d at 31 (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)). "Further, an offer to contract must be intentional and sufficiently definite in its terms, and no offer will be found to exist where its essential terms are unclear." Id. (citing Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc., 814 A.2d 217, 222 (Pa. Super. Ct. 2002)).

The promise to "stand behind PCS" and "make FNI whole" does not spell out the scope of SI's contractual obligations. FNI has failed to produce evidence that the parties ever reached a meeting of the minds on what specific actions SI was required to take to "stand behind PCS," what the scope of that obligation would be, who would determine the scope of that obligation, or how it would be determined if SI met that obligation. These failures render the alleged agreement enforceable. See Lackner, 892 A.2d at 31 (where parties do not agree on time or manner of performance, the agreement is too indefinite for a party to reasonably believe that it could be enforceable). The agreement to "make FNI whole" is also too vague to be enforced. The record shows that the parties never agreed on what they meant by that term. While they discussed that PCS would look at FNI's financials to determine if FNI suffered a financial loss, FNI presents no evidence that they ever agreed upon a formula to determine the value of the monetary term, let alone an agreement on that value. Indeed, the discussions between Lebowitz and Marrah show that they never agreed on a value. Leeds Dep. at 46:8-12. At most, the discussion concerning making FNI whole appears to be nothing more than an agreement to agree, which is not capable of being enforced. See Trowbridge v. McCaigue, 992 A.2d 199, 202 (Pa. Super. Ct. 2010) ("'An agreement to agree is incapable of enforcement, especially when it is

11

stipulated that the proposed compact shall be mutually agreeable.'") (quoting Highland Sewer & Water Auth. v. Forest Hills Mun. Auth., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002)); Mongeluzzi v. Pansini & Lessin, 61 Pa. D. & C.4th 52, 70 (Ct. Com. Pl. 2001) ("Under Pennsylvania law, an agreement to agree is not an enforceable contract.").

### 2. The Unjust Enrichment Claim

To survive summary judgment on its unjust enrichment claim against SI,[6] FNI must present evidence that shows: (1) a conferral of benefits occurred from one party to another; (2) the recipient experienced an appreciation of such benefits; and (3) the acceptance and retention of these benefits in such circumstances would be inequitable without payment of value. Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000); Schenk v. K.E. David, Ltd., 666 A.2d 327, 328 (Pa. Super. Ct. 1995). For the acceptance or retention of the benefit to be inequitable, a plaintiff must show that it "would be unconscionable for the party to retain [the benefit] without compensating the provider." Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (citing Torchia on behalf of Torchia v. Torchia, 499 A.2d 581(Pa. Super. Ct. 1985)).

SI asserts that it is entitled to summary judgment on FNI's unjust enrichment claim because: (1) there is no evidence that FNI conferred a benefit on SI since it made payments only to PCS and it was contractually obligated to make those payments; (2) SI did not financially benefit from continuing to operate PCS because PCS was not profitable; and (3) a claim for unjust enrichment cannot be based on the performance of an obligation that is independently owed to third parties. (Doc. Entry 77 19-22.) FNI responds that the summary judgment

---

[6] I note that the claim for unjust enrichment was brought against both defendants. On March 30, 2011, however, I granted the motion to dismiss the unjust enrichment claim against PCS. See Document #47 at 20-21.

evidence shows SI realized a benefit after PCS was closed down on June 1, 2009, because FNI's contractual payments to PCS from that point on were "swept" into SI's accounts. (Doc. Entry 83 at 29-30.)

I find that FNI has met its summary judgment burden to show evidence that it conferred benefits to SI. Deposition statements by Lawrence Reinhold, the CFO of SI, reveal that SI periodically "swept" money from PCS accounts into SI accounts, to be used "however Systemax chooses." (Doc. Entry 83, Ex. 7, Dep. of Lawrence Reinhold, at 38:3-17.) While SI argues any "benefit" it received from FNI was in its capacity as owner of PCS, and "not as Systemax as a separate entity," (see Doc. Entry 77 at 20), I find that this distinction is immaterial. Whether it received payments directly from FNI, or PCS deposited FNI funds that SI then "swept" it into its own accounts, it remains that SI received a benefit. SI cites to no case authority that makes a distinction between the conferral of direct and indirect benefits for purposes of stating an unjust enrichment claim.[7]

However, I find as a matter of law that FNI cannot establish that it would be unconscionable to allow SI retain the benefit under these circumstances. In Allegheny Gen. Hosp., the United States Court of Appeals for the Third Circuit, in affirming the grant of a motion to dismiss, held that a hospital could not bring an unjust enrichment claim against tobacco companies for un-reimbursed medical costs provided to nonpaying patients suffering from tobacco-related disease. Allegheny Gen. Hosp., 228 F.3d at 447. The Third Circuit determined that, even if the tobacco company received a benefit, allowing the companies to

---

[7] I also find that SI's argument that it did not financially benefit from continuing to operate PCS because PCS was not profitable has no legal significance. Any FNI funds that it swept into its own accounts lessened its losses on its PCS investment, thereby conferring a benefit. SI cites no authority to support a proposition that there is only unjust enrichment when the party unjustly enriched shows a net gain from the endeavor.

13

retain the benefit was not unjust because the "main" benefit was received by the nonpaying hospital patients, not the tobacco company, and the benefit granted was incidental to the hospital's independent duty to provide healthcare to nonpaying patients. Id.

The benefit conferred from FNI to SI was incidental to FNI's duty to make payments to PCS under the express written contract by which PCS was to be paid in exchange for providing the software. Since FNI continued to use the software, it had an independent contractual duty to PCS to continue to pay for it. Although it has produced evidence that the fees it paid to PCS were swept over to SI, FNI has not produced evidence that SI derived any benefit from those payments that was not incidental to FNI's contractual duty to pay fees to PCS. In addition, FNI makes no cogent argument to refute the fact that, as PCS's parent and sole stockholder, SI had the legal right to the funds. Accordingly, I find that SI's practice of transferring funds from its subsidiary's bank account to its own bank account is simply not enough to show that it was unjustly enriched by FNI's performance of its contractual obligations with PCS. Therefore, SI's motion for summary judgment on FNI's unjust enrichment claim will be granted.

### B. PCS's Motion for Partial Summary Judgment

PCS asserts that it is entitled to summary judgment on FNI's claims for lost profits and other non-direct damages because such damages are precluded by explicit provisions in the parties' contracts. (Doc. Entry 93 at 6-12.) I conclude that the Motion should be granted.

In December 2005, FNI and PCS executed the Master Agreement and the Professional Services Agreement governing FNI's implementation and use of PCS's software and services. See Def. Mot. Ex. A, PCS Master Agreement; Ex. B, Professional Services Agreement. Both contracts contained a limitation of liability provision that specifically excluded particular types

of damages that FNI could recover in the event of breach. See id. The Master Agreement's limitation of liability clause provided:

> IN NO CASE SHALL PCS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT TORT, OR ANY OTHER LEGAL THEORY. SUCH EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF SAVINGS OR REVENUE, LOSS OF USE OF ANY EQUIPMENT, LICENSED SOFTWARE, OR THE SYSTEM OF WHICH THEY ARE PART, OR ANY ASSOCIATED EQUIPMENT, COST OF CAPITAL, COST OF ANY SUBSTITUTE EQUIPMENT, FACILITIES OR DEVICES, DOWNTIME, THE CLAIMS OF THIRD PARTIES, AND INJURY TO PROPERTY.

Def. Mot. Ex. A at ¶ 5.4 (upper case in original). Similarly, the Professional Services Agreement provided:

> In no event shall either party be liable for any indirect, incidental, special, consequential, reliance or cover damages, or damages for loss of profits, revenue, data or use, incurred by either party or any third party, whether in action in contract or tort, even if the other party or any other person has been advised of the possibility of such damages. Neither party's aggregate liability for damages hereunder shall exceed the total amount of fees paid and/or due by Customer under the applicable Statement of Work.

Def. Mot. Ex. B at ¶ 5.4. Because these provisions clearly preclude PCS from being held liable for lost profits and non-direct damages, PCS asserts that it is entitled to summary judgment on FNI's claim for lost profits resulting from PCS's breach of contract. FNI does not dispute the fact that these provisions, if enforceable, preclude a significant portion of its claimed damages. Rather, it asserts that the limitation of liabilities provisions are unenforceable under Pennsylvania's version of the Uniform Commercial Code and, alternatively, are unenforceable because they are unconscionable. (Doc. Entry 94 at 23, 30.) I find that these arguments have no merit.

It is well established in Pennsylvania that "computer software is a 'good' within the meaning of the Pennsylvania version of the UCC." Advent Sys., Ltd. v. Unisys Corp., 925 F.2d

670, 676 (3d Cir. 1991). Section 2719 of the Pennsylvania Commercial Code recognizes the validity of provisions that limit remedies, but also provides an exception "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." 13 Pa. Cons. Stat. § 2719(a), (b). A remedy "fails of its essential purpose" when it "deprives either party of the substantial value of the bargain." Earl Brace & Sons v. Ciba-Geigy Corp., 708 F. Supp. 708, 710 (W.D. Pa. 1989); Strickler v. Peterbilt Motors Co., Civ. A. No. 04-3628, 2005 WL 834873, at *3 (E.D. Pa. April 11, 2005) (same); Hornberger v. Gen. Motors Corp., 929 F. Supp. 884, 890 (E.D. Pa. 1996) (same). Where, as here, some forms of contract damages are allowed but consequential damages are not, "'the validity of the consequential damage exclusion . . . [should] depend on the effectiveness of the limited remedy; if the limited remedy fails, so [should] the consequential damage exclusion.'" Strickler v. Peterbilt Motors Co., Civ. A. No. 04-3628, 2005 WL 1266674 (E.D. Pa. May 27, 2005) (quoting Caudhill Seed & Warehouse Co. v. Prophet 21, Inc., 123 F. Supp. 2d 826, 832 (E.D. Pa. 2000) (predicting how the Pennsylvania Supreme Court would rule on this issue)).

I find that the liability limitation provisions in the Master Agreement and Professional Services Agreement do not fail of their essential purpose. Importantly, the clauses do not exclude money damages. FNI may still recover the other monetary remedies for breach of contract available to a buyer of goods under Article II of the UCC, i.e., the difference between the cost of cover and the contract price, see 13 Pa. Cons. Stat. § 2712(b), or the loss resulting in the ordinary course of events from the breach, see id. § 2714(a). The provisions only limit FNI's ability to recover incidental damages,[8] consequential damages,[9] and lost profits.

---

[8] Incidental damages include "(1) the expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected; (2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and (3) any

This factor distinguishes the cases FNI cites to support its argument that the provisions are unenforceable. See, e.g., Caudill Seed, 123 F. Supp. 2d at 828 (construing limitation of liability provision that excluded "any **direct**, indirect, consequential or resulting damages . . . or for any lost profits . . . **or other monetary damages**" (emphasis added)). In Caudill Seed, Judge Reed determined that a contract providing that the "sole and exclusive remedy for any failure of the software shall be the warranties contained herein," while also disclaiming "any warranties of merchantability or fitness for a particular purpose," fails of its essential purpose because it "stymies a buyer's efforts to take advantage of the exclusive remedy she bargained for. . . ." Id. at 833. FNI cites to no decision where a limitation clause that permitted money damages — like that at issue here — was held to have failed of its essential purpose.

Even cases that do not permit money damages have been held enforceable. For example, in Strickler, Judge Schiller found that a clause limiting the plaintiff's remedy to "the repair or replacement of defective materials of workmanship," and also including a disclaimer of any warranty of merchantability or fitness for a particular purpose, did not fail of its own purpose because the clause did "not eliminate all of Plaintiff's remedies, but merely limits the scope of those remedies." Id. at *4 (citing Hornberger v. Gen. Motors Corp., 929 F. Supp. 884, 892 (E.D. Pa. 1996)). Judge Schiller also held that the limitation did not deprive the plaintiff of the substantial value of his warranty, which still required the defendant to repair or replace defective parts free of charge. Id. (citing Kruger v. Subaru of Am., Inc., 996 F. Supp. 451, 458 (E.D. Pa.

---

other reasonable expense incident to the delay or other breach and consequential damages." 13 Pa. Con. Stat. § 2715(a).

[9] Consequential damages resulting from the breach of the seller include "(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (2) injury to person or property proximately resulting from any breach of warranty." 13 Pa. Con. Stat. § 2715(b).

1998) (holding that disclaimer of consequential damages did not cause warranty to fail in essential purpose, which was to provide free repair or replacement of defective components)).

Because the liability limitation provisions in the Master Agreement and the Professional Services Agreement permit FNI to recover money damages, I conclude that they have not failed of their essential purpose and are enforceable as a matter of law.

I also find that the limitation of liabilities provisions at issue here, disclaiming only special, incidental, or consequential damages and lost profits, are not unconscionable. "A limitation or exclusion of liability is unconscionable where: (1) one of the parties to the contract lacked a meaningful choice about whether to accept the provision; and (2) the provision unreasonably favors the other party to the contract." Strickler, 2005 WL 834873, at *3 (citing Worldwide Underwriters Ins. Co. v. Brady, 973 F.2d 192, 196 (3d Cir. 1992); Koval v. Liberty Mut. Ins. Co., 531 A.2d 487, 491 (Pa. Super. Ct. 1987)). Limitation of liability provisions in sales contracts between merchants or experienced businesses are generally upheld because there is generally no disparity in the sophistication or bargaining power between the parties. Vasilis v. Bell of Pa., 598 A.2d 52, 54 (Pa. Super. Ct. 1991); see also Chatlos Sys, Inc. v. Nat'l Cash Register Corp., 635 F.2d 1081, 1086-87 (3d Cir. 1980) (finding that a portion of a liability limitation provision in a contract between a manufacturing company and a software company was valid and enforceable).

FNI argues that the limitation of liability provisions are unconscionable because (1) it lacked a meaningful choice about whether to accept the provisions, and (2) the contract unreasonably favored PCS. (Doc. Entry 94 at 30.) To support its first argument, FNI asserts that the limitation of liability provisions were a "take it or leave it" proposition, because it had no ability to negotiate additional remedies. (Id.) FNI claims that the contract unreasonably favored

PCS because it obligated FNI to make payments even if the software was deficient, and it effectively denied any financial remedy for losses caused by those deficiencies. (Id. at 30-31.) I find that these argument are not supported by the summary judgment record.

FNI presents no cogent evidence to create a triable issue that the limitation of liability provisions were a "take it or leave it" proposition, leaving it with no meaningful choice. Richard Amour, FNI's COO, testified that, in the course of obtaining the software for its new website, FNI was approached by "multiple software companies," it considered other companies, and it had discussions with other companies. Amour Dep. 28:8-29:19, 36:3-7. Amour negotiated the contract and was aware of the liability limitation provisions, which he thought was "standard contract language." Id. at 47:1-10; 48:6-12. He testified that "to us it was standard language. It's the way we do business." Id. at 48:7-8. He could not recall having any discussion with Mr. Winter about the limitation clause.[10] Id. at 46:22-25. FNI also did not have the agreements reviewed by counsel before executing them. Id. at 46:1-5.

FNI's claim that the contract unreasonably favored PCS because it effectively denied FNI any financial remedy for losses caused by the deficiencies in the software is also meritless for the reasons stated above. FNI is not barred from seeking money damages. It may still seek as

---

[10] Notwithstanding his earlier deposition testimony where he stated that he considered the limitation clauses to be standard contract language which he could not recall discussing, Amour submitted an affidavit on August 2, 2012, attesting that, "With regard to the section of the contract entitled Limitation on Liability, PCS representative Matt Ehrlich and/or Nanette Lazina told me that this particular section was non-negotiable per Systemax legal, both from the standpoint of PCS and the Systemax legal team that reviewed the contract." Doc. Entry 94, Ex. H ¶ 3. Amour does not explain the obvious contradiction between his testimony and his affidavit. I find that the affidavit does not create a genuine issue of fact on whether the clause is unconscionable. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 254 (3d Cir. 2007) (holding that "[w]hen a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition").

monetary remedies the difference between the cost of cover and the contract price, see 13 Pa. Cons. Stat. § 2712(b), or the loss resulting in the ordinary course of events from the breach, see id. § 2714(a).

Accordingly, I conclude that the limitation of liability clauses neither violate UCC § 2719, nor are they unconscionable as a matter of law. Thus, I find that PCS is entitled to summary judgment on FNI's claims for special, incidental or consequential damages, including lost profits.

## IV. CONCLUSION

I conclude that SI is entitled to summary judgment on all of FNI's remaining claims against it. I also conclude that PCS is entitled to summary judgment on FNI's claims for special, incidental or consequential damages, including lost profit damages. The following claims from the First Amended Complaint remain for trial against PCS: Count II (breach of the Master Agreement), Count III (breach of the Professional Service Agreement), and Count IV (breach of warranty).

An appropriate Order follows.